**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------X

THOMAS GIBB,                         :     Civil Action No.:

                                       :

               Plaintiff,         :

                                       :

           v.                   :     **COMPLAINT**

                                       :

TAPESTRY, INC. d/b/a Stuart Weitzman,    :

                                       :

               Defendant.    :     **Jury Trial Demanded**

                                       :

-----------------------------------------------------------------X

Plaintiff Thomas Gibb alleges against Defendant as follows:

**PRELIMINARY STATEMENT**

1.     Tapestry, Inc. ("Tapestry," or the "Company") is a fashion and design company that owns the brands Coach, Stuart Weitzman and Kate Spade – and the Head Designer/Creative Director at each brand holds a level of power and prestige within the Company.  Mr. Gibb was continuously sexually harassed by Stuart Weitzman's Head Designer and Creative Director, Giovanni Morelli, by enduring numerous unwanted touchings and endless comments about Mr. Gibb needing to have a "dick in his mouth" or a "dick in his ass."

2.     However, because of Mr. Morelli's position within Stuart Weitzman, this conduct was permitted without consequence.  Mr. Gibb complained to Human Resources ("HR") about Mr. Morelli's conduct, but HR refused to take any action whatsoever and the sexual harassment continued.  After Mr. Gibb retained counsel and there appeared to be a possibility of litigation, the Company permitted Mr. Morelli to "resign" in an attempt to shield itself from liability and in the hopes that it could "look good" to the public.  In a public announcement, the Company minimized Mr. Morelli's conduct and stated its admiration for Mr. Morelli's creative direction as the Company's former designer.

3.      On May 29, 2018, Mr. Gibb commenced an action against Tapestry and Mr. Morelli in the New York State Supreme Court alleging unlawful discrimination and sexual harassment.  *See Gibb v. Tapestry, Inc. et al*., No. 155005/2018 (the "State Court Action").  On June 18, 2018 – a mere three weeks later – Tapestry swiftly and blatantly retaliated against Mr. Gibb by both terminating his employment and commencing a separate lawsuit against him and a company that Mr. Gibb and his brother co-founded in 2014 called Homegrown for Good, LLC d/b/a Tidal New York ("Tidal"), which manufactures and sells inexpensive rubber flip-flops and employs veterans as part of its business model.  *See Tapestry, Inc. v. Gibb, et al*., No. 155005/2018 (the "Tapestry Action").

4.      Tapestry dubiously claimed that a May 28, 2018 article in the New York Times titled "Flip Flops for the Greater Good"[1] revealed Mr. Gibb's "extensive ongoing involvement with Tidal, including the fact that his involvement was beyond that of an investor," which, for some completely unexplained reason, Tapestry says was improper.  Not only is this is a pure fiction as the Article makes no reference to Mr. Gibb's ongoing involvement with Tidal, but Tapestry was at all times fully aware that Mr. Gibb maintained a small ownership interest in Tidal and actually declined Mr. Gibb's offer to divest himself of that interest if Tapestry felt it created any conflict.

5.      Moreover, Tapestry's lawsuit against Mr. Gibb amounts to nothing more than bloated speculative allegations of misconduct all stemming from the mere fact that Mr. Gibb uses an @tidalnewyork.com email address as his personal email account – an email address that Tapestry *always* knew Mr. Gibb used.  In reality, in falsely stating that the Article was some watershed moment of realization, Tapestry simply seized an opportunity it was looking for to

---

[1]      Available at: https://www.nytimes.com/2018/05/28/nyregion/flip-flops-for-the-greater-good.html

retaliate against Mr. Gibb and fabricate a basis to rid itself of an employee who had made valid and legitimate complaints about sexual harassment.  Tapestry was taking vindictive action against an employee who forced the Company to part ways with a Creative Director in whom it had made substantial investments.

6.      Tapestry's course of conduct is precisely the type of discriminatory and retaliatory conduct that the anti-discrimination statutes are intended to prevent.  Tapestry intended to send a message not only to Mr. Gibb, but to all employees across the Company: bring a claim against us, and even if it is meritorious, we will make sure you suffer.  Tapestry's conduct is completely reprehensible and cannot be condoned.

7.      Mr. Gibb seeks monetary, injunctive and declaratory relief for Tapestry's unlawful discriminatory and retaliatory conduct under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") and retaliatory conduct under both the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL").[2]

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

9.      Pursuant to 28 U.S.C. § 1391, venue is proper in this district because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

---

[2]      Plaintiff will include claims for discrimination under the NYSHRL and NYCHRL in an Amended Complaint upon the dismissal without prejudice of *Gibb v. Tapestry, Inc. et al.*, No. 155005/2018, which is currently pending in the Supreme Court of the State of New York, New York County.

## ADMINISTRATIVE PROCEDURES

10.     On June 4, 2018, Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and, on July 23, 2018, Plaintiff filed an Amended Charge of Discrimination with the EEOC.

11.     On July 30, 2018, the EEOC issued to Plaintiff a Notice of Right to Sue with respect to Plaintiff's claims against Defendant arising under Title VII.

12.     Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

13.     Plaintiff Thomas Gibb is the former Vice President of Product Development & Production Footwear for the Stuart Weitzman brand ("Stuart Weitzman") and a former employee of Tapestry, Inc.  Plaintiff currently resides in New York, New York.  At all relevant times, Mr. Gibb fell within the definition of a "person" and/or "employee" under all applicable statutes.

14.     Defendant Tapestry is a Maryland corporation with its principal place of business located at 10 Hudson Yards, New York, NY 10001.  Tapestry owns and operates the brands Coach, Stuart Weitzman and Kate Spade.  At all relevant times, Tapestry was Mr. Gibb's employer within the meaning of all applicable statutes.

## FACTUAL ALLEGATIONS

**I.      Mr. Gibb's Substantial Career Accomplishments**

15.     Mr. Gibb has enjoyed a prodigious career in the fashion and footwear industry.

16.     After starting his career in Nine West's Footwear Division in 2002, Mr. Gibb then joined Marc Fisher Footwear ("Marc Fisher"), where he experienced substantial success from 2004 to 2014.

17.     Mr. Gibb ultimately rose to the level of Vice President of Production & Product Development Planning/Merchandising at Marc Fisher Footwear and was being groomed to hold a top management level position even though he was only in his early 30s.  Indeed, even years after leaving, Marc Fisher offered Mr. Gibb the opportunity to return – including as recently as this year – in a top management capacity.

18.     In May 2014, while still at Marc Fisher, Mr. Gibb and his brother founded Tidal, a progressive flip-flop company dedicated to hiring veterans and utilizing environmentally-sound production methods.  Mr. Gibb's work at Tidal was so innovative that he and his brother secured a patent for a digital printing process that had never been seen or used in the footwear industry, and the company has been featured and written about in Forbes, Fox Business, Footwear News and the New York Times.

19.     Mr. Gibb also serves as a mentor for the Council of Fashion Designers of America ("CFDA") and is a member of their Fashion Manufacturing Initiative committee in conjunction with the New York City Economic Development Corporation.  The CFDA is among the most prestigious associations in the fashion industry – only accepting designers along the lines of Ralph Lauren and Tory Burch – and Mr. Gibb's involvement and exemplary contributions to these initiatives are unique and impressive.

20.     In short, Mr. Gibb's achievements are impressive, and his presence and accomplishments in the fashion and footwear industry are nearly unprecedented for someone of his age.

**II.     <u>Mr. Gibb's Tenure With Tapestry Brands</u>**

21.     Towards the beginning of 2017, Mr. Gibb received lucrative offers to join both Tory Burch and Alexander Wang, as well as to return to Marc Fisher Footwear in a Chief

Sourcing and/or Operations capacity as recently as January 2018, which was communicated to Mr. Gibb's superior Peter Charles.

22.     However, after meeting and interviewing with Coach Inc.'s ("Coach") senior management in February 2017, Mr. Gibb accepted a position as Coach's Vice President of Footwear Operations.

23.     As Coach's footwear division was underperforming, Mr. Gibb accepted the position with the hope and expectation of utilizing his significant experience and expertise to turn the struggling footwear division around.

24.     On March 27, 2017, Mr. Gibb started with Coach, and for the remainder of 2017, he successfully built Coach's Product Development organization, improved processes, increased margins and enhanced delivery performance metrics.

25.     Between April 2017 and January 2018, Mr. Gibb traveled to Asia seven times in order to build the Coach team and improve upon the brand's process and production.

26.     Coach's Design and Merchandising Teams were undeniably pleased with Mr. Gibb's performance and the steps that he implemented to transform the struggling footwear division.

27.     In October 2017, Coach changed its name to Tapestry, Inc. to include the three companies under the Tapestry umbrella – Coach, Stuart Weitzman and Kate Spade. Accordingly, although Mr. Gibb's initial employment agreement was with Coach, in October 2017, he became a Tapestry employee while still working for the Coach brand.

28.     In the fourth quarter of 2017, while still working for Coach, Mr. Gibb heard that Stuart Weitzman was experiencing internal struggles with its systems and processes.

29.     As Mr. Gibb was fully committed to Tapestry's overall success, as well as the success of each brand under its corporate umbrella, he volunteered to lend his talents, expertise and energy to the Stuart Weitzman team to assist in getting the brand's systems and processes back on track.

30.     As he became familiar with Stuart Weitzman, Mr. Gibb began to notice many gaps in the brand's systems and processes and identified potential future roadblocks and pitfalls that Stuart Weitzman would face.

31.     While working with the Stuart Weitzman team, Mr. Gibb's participation, forward-thinking approach and contributions were universally appreciated and praised, and discussions arose regarding Mr. Gibb building out the Stuart Weitzman team.

32.     Coincidently, around this same time in early 2018, PVH Corp, Inc. recruited one of Mr. Gibb's direct reports at Coach, Sang Lee, to run the underwear division for brands including Tommy Hilfiger, Calvin Klein, Izod, Arrow and Van Heusen.  In an effort to retain Mr. Lee, Tapestry offered to promote him to the role of Vice President of Product Development at Stuart Weitzman.

33.     When Mr. Lee declined the role with Stuart Weitzman, Mr. Gibb offered to move from Coach to Stuart Weitzman so that Tapestry could promote Mr. Lee to Mr. Gibb's role at Coach.

34.     This was precisely the enticement Mr. Lee needed, and he therefore agreed to assume Mr. Gibb's role, with Mr. Gibb joining Stuart Weitzman in March 2018.

**III.     Mr. Morelli Repeatedly Sexually Harasses Mr. Gibb**

35.     On March 1, 2018, Mr. Gibb officially joined Stuart Weitzman as the brand's Vice President of Product Development Footwear.

36.     Despite nothing but the utmost professionalism by Mr. Gibb, upon joining Stuart Weitzman, the brand's Creative Director, Giovanni Morelli, subjected him to a constant barrage of sexual harassment.

37.     As Stuart Weitzman's Creative Director, and therefore the *de facto* "face" of the brand, Tapestry effectively allowed Mr. Morelli to operate outside the normal confines of acceptable conduct and made seemingly endless excuses and exceptions for him.

38.     Indeed, acknowledging the Company's substantial investment in Mr. Morelli and its interest in protecting him, a high-ranking Stuart Weitzman HR executive recently told Mr. Gibb, "We all need Giovanni to succeed."

39.     From the very first day that Mr. Gibb worked with Mr. Morelli, Mr. Morelli constantly injected sexually-charged conversation and innuendo into the workplace, making those around him, including Mr. Gibb, extremely uncomfortable.

40.     During Mr. Gibb's very first meeting at Stuart Weitzman, Mr. Morelli welcomed him by asking, "**How is your dick?**"  This was an opening overture in what became a bombardment of offensive conduct from Mr. Morelli.

41.     As Mr. Gibb hoped to start this new chapter in his career on a good note, and because Mr. Morelli's acceptance was important to Mr. Gibb's success as Stuart Weitzman's head of Product Development, Mr. Gibb initially attempted to disregard Mr. Morelli's behavior.

42.     However, when it ultimately became apparent that Mr. Morelli's conduct was not going to improve, Mr. Gibb complained on multiple occasions to Stuart Weitzman's HR department, with each such complaint being ignored entirely.

43.     For instance, but only by way of example, on March 7, 2018, Mr. Gibb took his first of several trips to Spain to work with Stuart Weitzman's Design Team, including Mr. Morelli.

44.     Upon Mr. Morelli's arrival in Spain the following day, he immediately began engaging in sexually harassing conduct in front of the entirety of the Spain "Shoes By Stuart" office, including constantly touching Mr. Gibb's body and the back of his legs and repeatedly asking him, "**How is your dick?**" and "**Is there any way you would ever consider not being straight?**"

45.     Mr. Morelli's touching of Mr. Gibb was unwelcomed, offensive and inappropriate, and his comments made Mr. Gibb extremely uncomfortable.

46.     As another example, during the course of a March 16, 2018 shoe prototype fitting with Mr. Morelli and other members of the Design Team, Mr. Morelli asked Mr. Gibb for his shoe size.  When Mr. Gibb stated that he wore a size 45 shoe, Mr. Morelli responded, "**Wow you must have a huge dick – probably 25 centimeters.**"  Mr. Morelli proceeded to say, "**You are so straight though, it's so sad.**"

47.     Around this time, Mr. Morelli also began to refer to Mr. Gibb as "**Tommy Straight**," a nickname that Mr. Morelli continued to use throughout the duration of his tenure at Tapestry.

48.     By way of another example, on March 19, 2018, during a calendar review meeting with the Product Development and Design Teams, Mr. Morelli came around the table to where Mr. Gibb was sitting, put his arm around Mr. Gibb and asked, "**What's wrong Tommy Straight?**"  Mr. Morelli proceeded to tell Mr. Gibb that he seemed "very uncomfortable," and stated, "**Perhaps if you had a dick in your ass you would be more comfortable**."

49.     On March 20, 2018, Mr. Gibb complained to Molly Rosen of HR about Mr. Morelli's sexually harassing conduct, including Mr. Morelli's comments made at the previous day's calendar review meeting.

50.     However, despite Mr. Gibb's complaint about Mr. Morelli, the Company failed to take any remedial action whatsoever, and Mr. Morelli's sexually harassing conduct was permitted to proceed unabated.

51.     For instance, on March 25, 2018, when Mr. Gibb informed Mr. Morelli that he had arrived in Spain for meetings, Mr. Morelli responded via text message, "**Yes sexy man**." Throughout the trip, Mr. Morelli continued to comment on Mr. Gibb's body, including making comments about Mr. Gibb's genitals, and referred to Mr. Gibb as "Tommy Straight" to everyone with whom he spoke.

52.     During the course of the same Spain trip, Mr. Morelli introduced Mr. Gibb to a crowd of people and stated, "**This is Tommy Straight.  Even if I saw him with a dick in his mouth, I wouldn't believe it – he is too straight.**"

53.     On April 21, 2018, as Mr. Gibb was preparing to return to Spain to join the Stuart Weitzman team, he asked Mr. Morelli if he needed Mr. Gibb to bring him anything, to which Mr. Morelli responded "**Only your straight body.**"

54.     During this trip, Mr. Gibb introduced a former colleague to the Stuart Weitzman Product Development and Design Teams, including Mr. Morelli.  While speaking to the former colleague, Mr. Morelli immediately began referring to Mr. Gibb as "Tommy Straight" and again stated, "**Even if I saw him with a dick in his mouth I could never believe it.**"

55.     From May 2, 2018 through May 4, 2018, Mr. Gibb was out of the office for a CFDA conference meeting in Los Angeles.  When Mr. Gibb returned to work on Monday, May

7, 2018, he saw that Mr. Morelli had drawn **two large penises** and the name "Tommy Straight" on the whiteboard in his office.

56.     As Mr. Gibb's office has glass windows, these vulgar and obscene drawings were on display for all on his floor to see.

57.     Mr. Gibb sent photos of this to Ms. Rosen in HR complaining, "This is the artwork I came back to in my office."

58.     Ms. Rosen confirmed her awareness of Mr. Morelli's inappropriate course of conduct but treated it as a joke, responding, "**Hahaha I'm dying.  Giovanni??**"

59.     Ms. Rosen's response demonstrated the acquiescence to this conduct at the Company, such that even HR professionals perceived this highly inappropriate conduct as a joke.

60.     Of course, Mr. Gibb did not view Mr. Morelli's conduct as a joke or think it was funny.  Tellingly, Mr. Gibb did not even have to identify Mr. Morelli by name for Ms. Rosen to know that he had made the crude drawing.

61.     Ms. Rosen sent Mr. Gibb a subsequent message acknowledging that Mr. Morelli's conduct was "**[n]ot ok on so many levels**," but neither she nor anyone else at the Company took any ameliorative action whatsoever in response to Mr. Gibb's complaints.

62.     The conduct described above is representative of the hostile work environment in which Mr. Gibb was forced to work and which the Company permitted to exist, and is not intended to be an exhaustive account of Mr. Morelli's offensive and discriminatory behavior.

63.     Upon information and belief, Mr. Gibb is not the only employee who has raised sexual harassment and discrimination complaints against Mr. Morelli.

64.     Upon information and belief, other employees in addition to Mr. Gibb have raised complaints of sexual harassment and discrimination against Mr. Morelli.

65. Upon information and belief, other employees have raised complaints that Tapestry's HR did not adequately respond to or investigate complaints of sexual harassment and discrimination.

**IV.     Mr. Gibb Retains Counsel to Seek Assistance**

66. On May 15, 2018, Mr. Gibb contacted Tapestry through counsel and filed another written complaint of sexual harassment.

67. On May 21, 2018, only after Mr. Gibb retained counsel and Tapestry realized that legal action might follow, Tapestry announced that Mr. Morelli had "resigned."  Upon information and belief, this "resignation" was actually a forced termination.

68. In an announcement to the Company's employees, Tapestry wrote that it "is committed to an environment where every individual feels respected," but acknowledged that Mr. Morelli's "behavior fell short of these standards."

69. Incredibly, despite the fact that Mr. Morelli was forced out of Tapestry for engaging in sexual harassment and violating the Company's code of conduct, the announcement also stated that "we greatly admire" Mr. Morelli.

70. Significantly, despite this acknowledgement and Mr. Gibb's numerous complaints to HR about Mr. Morelli's conduct, the Company accommodated Mr. Morelli by allowing the internal and external statements to be that he resigned rather than being terminated.

71. Furthermore, on May 23, 2018, acknowledging that Ms. Rosen had completely failed to take appropriate action in response to Mr. Gibb's multiple complaints about Mr. Morelli's sexually harassing conduct, the Company terminated Ms. Rosen's employment (though it also announced this as a "resignation" as well).

72.     The Company's announcements did not reinforce the proposition that retaliation against those who raise complaints would be prohibited.  Therefore, immediately after the announcement, the many employees who were loyal to and worked closely with Mr. Morelli began to be cold towards Mr. Gibb.

73.     The Company's actions upon receiving notice that Mr. Gibb intended to seek legal action are, quite simply, "too little too late," and a transparent attempt to shield itself from liability rather than take legitimate remedial action.

74.     Furthermore, on May 15, 2018, immediately following Mr. Gibb's retention of counsel, Peter Charles (Tapestry's Global Head of Supply Chain) informed Mr. Gibb during a telephone conversation that that he was "behind him 150 percent" and supported his decision.

75.     However, the next day, after Mr. Charles had spoken with internal management and counsel, his demeanor changed and he showed disapproval for Mr. Gibb's decision to raise complaints of harassment.  Mr. Charles asked Mr. Gibb, "what's your end-game?" as if to imply that raising these complaints would not have a positive result.

76.     Mr. Gibb has, at all times, done nothing other than approach his work and relationships at Tapestry with the highest degree of respect, dignity and professionalism, and that approach was regrettably not returned by either Mr. Morelli or the Company.

**V.      Tapestry Retaliates Against Mr. Gibb**

77.     On May 29, 2018, Mr. Gibb commenced the State Court Action against Tapestry and Mr. Morelli asserting claims for sexual harassment and discrimination under the NYSHRL and NYCHRL.

78.     A mere 20 days later, on June 18, 2018, Tapestry swiftly and blatantly retaliated against Mr. Gibb by both terminating his employment and commencing the Tapestry Action against him and Tidal.

79.     In terminating Mr. Gibb's employment and commencing the Tapestry Action, Tapestry dubiously claimed that a May 28, 2018 article in the New York Times titled "Flip Flops for the Greater Good" (the "Article") revealed Mr. Gibb's "extensive ongoing involvement with Tidal, including the fact that his involvement was beyond that of an investor," which, for some completely unexplained reason, Tapestry says was improper.

80.     According to Tapestry, the Article revealed that Mr. Gibb's previous representation to Tapestry that he had a "passive" role in Tidal was false, and the true nature of his ongoing relationship with Tidal violated both the Conflicts of Interest Provision and Confidentiality Provision contained in Tapestry's Code of Conduct.

81.     Contrary to Defendant's assertion, the Article merely identifies Mr. Gibb as a co-founder of Tidal (which is accurate) while making no reference whatsoever to Mr. Gibb's ongoing relationship or involvement with Tidal.

82.     Moreover, when Tapestry hired Mr. Gibb in 2017, Mr. Gibb fully disclosed his minority ownership interest in Tidal, and Tapestry has, at all times, been aware of the extent of Mr. Gibb's ongoing interest in Tidal.

83.     By way of example only, on October 15, 2017, Tapestry's Chief Executive Officer, Victor Luis, visited Tidal's factory in New Rochelle, New York with Mr. Gibb.  After the visit, Mr. Luis sent Mr. Gibb a message stating, "Loved seeing it and you have much to be proud of buddy."

84.     Likewise, following Mr. Luis's visit, Mr. Luis asked Tapestry's President and Chief Administrative Officer, Todd Kahn, to ensure that Mr. Gibb's relationship with Tidal would not create a conflict of interest for Mr. Gibb or Tapestry.  Mr. Gibb provided a comprehensive review of Tidal's capital structure to Mr. Kahn, and offered to divest his interest in Tidal if Mr. Kahn considered it necessary, but Mr. Kahn told Mr. Gibb that he need not do so.

85.     In any event, the conduct of which Tapestry complains in the Tapestry Action in no way violates Tapestry's Code of Conduct, and there is no good faith basis for asserting any of the claims Tapestry asserts in the Tapestry Action.  Tapestry's lawsuit against Mr. Gibb amounts to nothing more than bloated, speculative allegations of misconduct all stemming from the mere fact that Mr. Gibb uses an @tidalnewyork.com email address as his personal email account – an email address that Tapestry *always* knew Mr. Gibb used.

86.     Indeed, the retaliatory and baseless nature of the Tapestry Action is underscored by the fact that Tapestry has chosen to sue Mr. Gibb for allegedly breaching the Code of Conduct, but has not sued Mr. Morelli.  In suing Mr. Gibb for allegedly breaching the Code of Conduct, Tapestry has clearly taken the position that the Code of Conduct is an enforceable agreement applicable to all Tapestry employees, whether or not the employee has been terminated, and that a breach of the Code of Conduct is an actionable offense.

87.     Notably, the Code of Conduct requires "compliance with the laws," including "labor" laws, and "prohibits discriminatory practices, including harassment."  Nevertheless, despite the fact that Mr. Morelli has been accused of sexual harassment by Mr. Gibb and other employees, and Tapestry admitted that Mr. Morelli's "behavior fell short of [Company] standards," Tapestry has not sued Mr. Morelli for breach of the Code of Conduct or anything else.

88.     In suing Mr. Gibb for allegedly breaching the Code of Conduct, but not suing Mr. Morelli, Tapestry's course of conduct demonstrates that it either does not genuinely consider the Code of Conduct to be an enforceable agreement or that it only enforces the Code of Conduct to retaliate against employees who raise legitimate complaints – or both.

89.     In reality, in relying upon the Article as the supposed watershed moment which formed the basis to terminate Mr. Gibb's employment and commence the Tapestry Action, Tapestry seized an opportunity to fabricate a basis to rid itself of an employee who had made valid and legitimate complaints about sexual harassment.  Tapestry was taking vindictive action against an employee who forced the Company to part ways with a Creative Director in whom it had made substantial investments.

90.     Tapestry further knew that, because both Mr. Gibb and his brother maintained an ownership interest in Tidal, Mr. Gibb and his brother would be harmed by Tapestry's pursuit of a baseless and retaliatory legal claim against Tidal.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of Title VII)

91.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

92.     By the conduct described above, Defendant Tapestry has discriminated against and/or permitted and/or acquiesced to the discrimination of Plaintiff on the basis of his gender and/or sexual orientation in violation of Title VII, and as a result he has been denied the same terms and conditions of employment available to other employees.

93.     By the conduct described above, Defendant Tapestry has discriminated against and/or permitted and/or acquiesced to the discrimination of Plaintiff on the basis of his gender

and/or sexual orientation in violation of Title VII by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or remedy a hostile work environment.

94.      As a direct and proximate result of Defendant Tapestry's unlawful discriminatory conduct and harassment in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and emotional harm for which he is entitled to an award of damages.

95.      Defendant's unlawful discriminatory conduct constitutes knowing, malicious, willful, wanton and reckless violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(Retaliation in Violation of Title VII)**

96.      Plaintiff hereby repeats, reiterates and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

97.      By the conduct described above, Defendant retaliated against Plaintiff in violation of Title VII by unlawfully and materially changing the conditions of Plaintiff's employment because he both made protected complaints and commenced the State Court Action regarding Defendant's unlawful, discriminatory and harassing treatment based on Plaintiff's gender and/or sexual orientation by, *inter alia*, terminating Plaintiff's employment and commencing the retaliatory Tapestry Action against Plaintiff and Tidal.

98.      As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and emotional harm for which he is entitled to an award of damages to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

17

99.     Defendant's unlawful retaliatory conduct constitutes knowing, malicious, willful, wanton and reckless violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)

100.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

101.     By the conduct described above, Defendant retaliated against Plaintiff in violation of the NYSHRL by unlawfully and materially changing the conditions of Plaintiff's employment because he both made protected complaints and commenced the State Court Action regarding Defendant's unlawful, discriminatory and harassing treatment based on Plaintiff's gender and/or sexual orientation by, *inter alia*, terminating Plaintiff's employment and commencing the retaliatory Tapestry Action against Plaintiff and Tidal.

102.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and emotional harm for which he is entitled to an award of damages to the greatest extent permitted under law.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)

103.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

104.     By the conduct described above, Defendant retaliated against Plaintiff in violation of the NYCHRL by unlawfully and materially changing the conditions of Plaintiff's employment because he both made protected complaints and commenced the State Court Action regarding Defendant's unlawful, discriminatory and harassing treatment based on Plaintiff's gender and/or

sexual orientation by, *inter alia*, terminating Plaintiff's employment and commencing the retaliatory Tapestry Action against Plaintiff and Tidal.

105.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and emotional harm for which he is entitled to an award of damages to the greatest extent permitted under law, in addition to reasonable attorneys' fees and costs.

106.    Defendant's unlawful retaliatory conduct constitutes knowing, malicious, willful, wanton and reckless violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendant for the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.    An order that Defendant engage in injunctive measures aimed at remedying the unlawful conduct described herein so that other employees will not be subject to the same unlawful conduct;

C.    An award of damages against Defendant, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages;

D.    An award of damages against Defendant, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress;

E.    An award of punitive damages in an amount to be determined at trial;

F.      Prejudgment interest on all amounts due;

G.      An award of Plaintiff's reasonable attorneys' fees and costs; and

H.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: July 31, 2018
  New York, New York      Respectfully submitted,

              **WIGDOR LLP**

              By: _____

                David E. Gottlieb
                Kenneth D. Walsh

              85 Fifth Avenue
              New York, NY 10003
              Telephone: (212) 257-6800
              Facsimile: (212) 257-6845
              dgottlieb@wigdorlaw.com
              kwalsh@wigdorlaw.com

              *Counsel for Plaintiff*